THE MUNICIPAL COUNCIL OF CAROLINA v. SALDAÑA ET AL.

APPEAL from the District Court of San Juan.

No. 598.—Decided April 28, 1911.

CONDEMNATION OF PROPERTY—AMOUNT OF INDEMNITY.—Upon justifying the necessity of taking the land which is sought to be condemned, the indemnity allowed the owner should comprise not only the value of the property condemned but also a compensation for the damages caused by the loss of the property.

ID.—CONTRADICTORY EVIDENCE—FINDING OF THE COURT BELOW.—The evidence referring to the amount of the indemnity that should be allowed in this case being contradictory, and as it has not been shown that the lower court was actuated by passion, prejudice, or partiality, or that it had committed manifest error, its finding must be accepted, especially when the defendants have not proven the amount of damages that the deprivation of the land would have caused them and the sums fixed by the lower court seem to be the proper compensations for said deprivation.

The facts are stated in the opinion.

*Mr. Juan Hernández López* for appellants.

*Messrs. Texidor* and *Cautiño* for respondent.

MR. JUSTICE DEL TORO delivered the opinion of the court.

The Municipal Council of Carolina filed complaints against José Esteban Saldaña and Andrés Crosas seeking the condemnation of certain lands and establishment thereon of a right of way for the public service, which complaints were answered separately by the defendants. Subsequently, on motion of the parties, both actions were joined and disposed of in a judgment from which the present appeal has been taken.

The fundamental facts alleged by the plaintiff corporation were, briefly stated, as follows:

That the Municipal Council of Carolina decided unanimously to proceed to the construction and installation of an aqueduct for the use of the town.

That upon a study of the work it was found absolutely necessary for the construction and exploitation of the same to take a strip of land 2 meters wide by 694 meters long, running from the Río Piedras-Carolina highway in a straight line toward the southeast, said strip consisting wholly of land owned by Saldaña, up to the boundary of other lands belonging to T. G. Waymouth, and to establish a right of way over said estate of Saldaña, through a private road running from the boundary line between that estate and the highway, to Waymouth's boundary line; that the occupation of the strip of land shall be permanent, the object being to lay the pipes of the aqueduct at a depth which, throughout its whole extent,

except two points occupied by a drain cock and an air hole, may permit the cultivation of the surface; the right of way to be used continuously during the construction of the aqueduct and, after that, only for the passage of employes and persons in charge of the conservation of the aqueduct and of carts for the conveyance of repair materials, when necessary.

That it was also found of absolute necessity to occupy permanently (a) a strip of land 2 meters wide by 586 long, running from the boundary line between the lands of Waymouth and those of the defendant, Crosas, and through the latter to a hillock belonging to Crosas, in a straight line toward the southeast, for the purpose of laying the pipes of the aqueduct in the manner above described; (b) a space covering 1.40 *cuerdas* on said hillock belonging to Crosas, for the purpose of establishing thereon the pump house, drive wells, reservoir, and connecting road; and (c) a right of way through a private road within Crosas' property, extending from Waymouth's boundary line in a southeasterly direction to the aforesaid hillock, and thence, at the point where the reservoir is to stand, to the Carolina River, in a northwesterly direction.

That in view of this necessity the Municipal Council of Carolina applied to the Executive Council, requesting that the occupation of the lands and establishment of the right of way be declared of public utility, and the Executive Council, after complying with the prescribed formalities, by a resolution of February 2, 1909, made the declaration in accordance with the request of the municipal council, said resolution being inserted in full in both complaints.

That the defendants refused to surrender the land and to permit the rights of way.

That the Municipal Council of Carolina is willing to pay the defendant, Saldaña, for the occupation of the strip of land at the rate of $100 per *cuerda,* and for the right of way an indemnity of $50; and to the defendant, Crosas, at the rate of $50 per *cuerda* and $80 more for the right of way.

That the occupation of the lands and establishment of the right of way are absolutely necessary for the construction and exploitation of the aqueduct.

The defendants answered, denying the facts alleged in the complaints in so far as they directly or indirectly contradicted the following:

That for the construction and exploitation of the aqueduct the condemnation of the strips of land and constitution of the rights of way referred to in the complaints are not of absolute necessity; and

That the lands sought to be condemned and the rights of way proposed to be established would require a much larger indemnity than that offered by the plaintiff in both cases.

A hearing having been had, the court rendered judgment declaring that the facts and the law were in favor of the plaintiff and against the defendants, and accordingly sustaining the complaint, with costs. In the judgment the condemnation of the lands, which are specifically described, is declared of absolutely necessity, as also the rights of way which are specified with precision, the sums to be paid by the plaintiff to the defendants are determined, and, as to the rights of way, the execution of the proper public instruments is ordered to be proceeded with.

The law applicable to this case is that of 1903 providing for the condemnation of private property, as amended in 1908. (Laws of 1908, p. 94 *et seq.*)

Section 2 of said law, as amended, reads as follows:

"Section 2.—That private property, and also that defined in the second paragraph of section 328 of the Civil Code as *'bienes patrimoniales,'* may be taken, damaged, or destroyed in whole or in part or a permanent or temporary easement or servitude may be imposed thereon for lawful purposes when declared of public utility by the Executive Council. The declaration of public utility shall be made by the Executive Council, upon hearing in all cases such parties as may desire to be heard as to the advisability of making such declaration and as to the necessity, for a better public service and for the furtherance of the proposed work, of the condemnation or condemna-

tions of such private property as shall have to be taken, or of the easements or servitudes with which such private property shall have to be encumbered. The Executive Council, on making the declaration that a certain work is of public utility, shall describe specifically the property which is to be condemned or encumbered for the purposes of said work.''

The provision of law quoted above was strictly applied in the present case.

The public utility of the construction of the aqueduct was declared by the Executive Council after public hearings had been held by it and by its Committee on Franchises, and upon making such declaration the Executive Council specifically described the pieces of property that were to be condemned and encumbered. The Council, in its investigation and resolution, did not confine itself to declaring, in general terms, the public utility of the work contemplated by the municipal council, but, in accordance with the law, it also declared the necessity of the condemnation and encumbrance of the lands specified in the complaints.

Section 4, as amended, of the aforesaid condemnation act, reads:

''Section 4.—Where a work has been declared of public utility and, for any reason, the owners of the property to be condemned refuse to consent to such condemnation or condemnations as may be required, a cause of action shall thereby accrue to the person who is to perform said work, who may bring said action against the said owners in the district court for the judicial district within which the whole or part of said property is situated, in the regular manner for the commencing of actions provided by the Code of Civil Procedure. Should such action be brought as aforesaid a copy of the declaration of public utility made by the Executive Council shall be inserted in full in, or shall accompany, the complaint or a certified copy attached thereto, and the plaintiff shall make a deposit of such amount as he may be willing to pay for the property which is to be the subject of condemnation.''

The foregoing provision of law was also strictly applied in this case. The defendants having objected, the plaintiff

resorted to the court of justice having competent jurisdiction, which, upon hearing the allegations and evidence, declared the condemnation of the lands and constitution of the rights of way to be necessary, and fixed the amount of indemnities to be paid by the plaintiff to the defendants.

The appellants base their appeal upon the following grounds:

1. That the district court violated section 355 of the Revised Civil Code.

2. That it did not allow the defendants a fair indemnity.

3. That at most the judgment allows indemnity for the things taken, but fixes no compensation for damages; and

4. That the judgment taxes all the costs against the defendants.

Let us examine the first ground. The appellants allege that in order to decree the condemnation in this case it was necessary to show the absolute necessity of taking the lands belonging to them for purposes of public utility, and that such absolute necessity was not demonstrated.

Our civil law prescribes that "no person shall be deprived of his property except it be by a competent authority and for a justified purpose of public utility, and after having been properly indemnified."

Let us see whether this principle of law, which has been sustained in all its integrity on various occasions by this Supreme Court, has been violated or correctly applied in the case under consideration.

The work which the Municipal Council of Carolina seeks to construct is an aqueduct for the general service of the town. Its public utility is so evident that no discussion is possible upon this point. Moreover, said utility was so declared by the Executive Council of Porto Rico after compliance with all the legal formalities.

The controversy in this case bears upon the necessity of occupying the lands specified in the complaint to the exclusion of others.

As ground for his decision the district judge delivered an opinion from which we shall quote the paragraphs relating to the examination and consideration of the evidence, because we find them in perfect accord with the final result of our own examination and consideration of said evidence:

"Under the plan for the works of the aqueduct, as drawn up by Engineer del Valle Zeno, which is the subject of this controversy, the water is taken from the Río Grande of Loíza, at a distance of about two kilometers from the town, and is raised to a hill situated on lands of Mr. Crosas for the purpose of giving it sufficient pressure on its way to the town.

"And according to that plan it is necessary to build on lands belonging to Mr. Crosas the tube wells for taking the water, or pump house, and thence by means of pipes, to raise the water to the reservoirs situated on top of the hill, so that from there it may, through pipes, reach the town after going over lands of said Crosas, of Waymouth, and, lastly, of Saldaña, which are the nearest to the town.

"Two objections, as appears from the evidence, have been raised to this plan and, therefore, to the authorization requested of the court in compliance therewith. One is to the effect that, without inconveniencing Crosas and Saldaña, a reservoir may be constructed near the town of Carolina at a place where the river passes close to it and where there is a knoll called 'Alto del Tamarindo,' which although not sufficiently high to give the required pressure to the water, the latter may be attained by the construction of a tower; and the other objection is that even if the reservoirs were built on the hill belonging to Crosas, the pipes might be laid so as to reach town without the necessity of crossing the lands of Saldaña, or, at least, going straight through them, as contemplated, but following the windings of the river in order to obstruct said lands the least possible.

"Having in mind the declarations of Mr. del Valle and of Mr. Luis Rubio who, on behalf of the Department of Public Works, was on the spot for the purpose of examining and studying Mr. del Valle's project, we reach the conclusion that the most suitable and convenient place in which to establish the Carolina aqueduct is the one selected by Mr. del Valle, not only because the work would turn out cheaper, and therefore of more benefit to the community than if a tower were constructed, but because it offers the further advantage, which the tower does not, of having the water taken already filtered from a sandy bed, and this would be quite a boon to the

residents of Carolina. And notwithstanding the explanations given by the expert witness, José Antonio Canales, on behalf of the defendants, we gather from all the evidence taken that there would be a better guarantee offered for the future by constructing the reservoirs on solid ground than on towers in countries such as ours, subject to frequent hurricanes and earthquakes. And viewing the question from an economical standpoint the construction of the tower would prove much more expensive than the work projected by Mr. del Valle, and, as a logical consequence, it would bring about an increase of capital and a corresponding increase in the price to the consumer of the water.

"Briefly, then, we are of the opinion that, considering the work of the aqueduct as it has been projected, the likeliest proposition is that of constructing the reservoirs on the hill belonging to Crosas and not on a tower in 'Alto del Tamarindo.'

"Nor do we believe practicable the alternate solution proposed that instead of laying the pipes in a straight line, as projected, through the lands of Saldaña, they be shifted and made to follow the windings of the river.

"From the expert evidence upon this point it appears that elbows in the latter case would necessarily have to be placed, by reason of which and of the friction in the current the pressure of the water would be diminished, and this defect would have to be corrected by giving more pressure in the reservoirs.

"For these reasons neither does such solution appear to us practicable, and we are in favor of having the pipes laid in a straight line through the lands of Saldaña, as proposed."

Taking the foregoing into consideration it must be concluded that the necessity of condemning the lands specified in the complaints for the purposes therein stated was fully demonstrated in this case, the object being the construction of an aqueduct for the use of all the residents of Carolina, the water to be taken at a point where it is purest, a reservoir constructed at the proper place, and the pipes to be laid over the shortest route, thereby attaining greater pressure with less expense in the construction and conservation of the work.

Let us examine the grounds relating to compensation.

The indemnification shall comprise not only the value of the thing whereof the owner is deprived but also a compensa-

tion for any damages and injuries which may be caused him by the deprivation of the property, says the closing paragraph of section 355 of the aforesaid Civil Code.

In the present case the plaintiff stated in its complaints the sums it was disposed to pay the defendants, who alleged that said sums were not adequate. Both parties produced evidence, which proved contradictory, and the court decided the conflict by fixing as just and adequate indemnification those offered by the plaintiff. The judge expressed himself as follows:

"The Municipal Council of Carolina offered to pay Mr. Saldaña for the land to be occupied by the pipes at the rate of $100 per *cuerda,* and for the right of way an indemnification of $50.

"As to Mr. Crosas, he was offered $50 per *cuerda* for the land occupied and $80 for the right of way.

"For the purpose of establishing the value of the lands the plaintiff brought in two expert witnesses who appraised the land belonging to Saldaña, taking into account its proximity to the town and the kind of cultivation to which it could be dedicated, at the rate of $100 per *cuerda;* and the land belonging to Crosas at $80 for the level and $50 for the hilly. The same party produced certificates of the assessment of those lands for the purposes of taxation, from which it appears that the land belonging to the former is assessed at $71.50 per *cuerda* and that of the latter at $31.30.

"On their part the defendants presented an expert who was not a resident of that locality, as were the others, and who saw the estate only for the purpose of the testimony he was to give at the trial. This expert appraised the lands of Saldaña at $400 per *cuerda* and those of Crosas at $100 the level and $50 the hilly. Moreover, he produced a copy of a deed from which it appears that Saldaña, in 1886, had sold 15.75 *cuerdas* at 200 *pesos* each for the establishment of the 'Progreso' central.

"From the evidence taken together we come to the conclusion that the price offered Saldaña and Crosas by the Municipal Council of Carolina was equitable and just. They were offered a price which was shown by expert testimony to be the value at which they were assessed for purposes of taxation. And the fact that 15.75 *cuerdas* of said land were sold in 1886 for the 'Progreso' central at a certain price is no proof that such is the present value of those lands, when

we consider, on the one hand, that they were sold to establish a central factory, and on the other that it has not been shown that the prices of 1886 were equal or similar to those now ruling. As to the testimony of the expert on behalf of the defendants, it struck us as being somewhat exaggerated, the more so when his appraisement is compared with the sale effected in 1886 for a central factory.

"And the price offered by the municipal council is the more equitable when it is considered that the laying of the pipes that are to cross the lands of Saldaña and Crosas does not in the least affect the cultivation of the strip inasmuch as they are to be laid at a depth, of 80 centimeters, while the vegetable soil at that place does not exceed 45 centimeters, and thus the tilling of the land is not interfered with.

"As regards the compensation offered for the right of way, no objection has been made to the valuation given, and we must, therefore, conclude that it is just."

It has not been shown that the court was moved by passion, prejudice, or partiality, nor that it had committed manifest error, and, therefore, we cannot alter its conclusion, especially when it was not expressly alleged by the defendants in their answer nor proved at the trial that the construction of the aqueduct would cause them certain real and positive injuries, while the amounts fixed by the trial judge seem to be a fair indemnity for the occupation of the lands and establishment of the rights of way, considering the circumstances of the case.

Lastly, let us examine the ground referring to the costs. The defendants do not question the right of the district court to impose costs in cases of this nature, but they allege that inasmuch as the interest involved in each of the consolidated actions is less than $500 counsel fees cannot be recovered as costs.

The court, in its judgment, merely imposes the costs without stating whether or not counsel's fees are included therein. This question, it would seem, is still pending decision in the district court. The memorandum of costs and disbursements having been filed by the plaintiff it was objected to by the

defendants, and we do not yet know whether the district court has approved, modified, or rejected said memorandum. This being the case, our decision on this point would be premature, especially since the law expressly authorizes appeals from judicial decisions on objections made to memorandums of costs.

The appeal should be dismissed and the judgment appealed from, affirmed.

*Affirmed.*

Chief Justice Hernández and Justice Wolf concurred.

Justices MacLeary and Aldrey did not take part in the decision of this case.